**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| ANA PERDOMO PAZ, ENRIQUE VILLAROEL, ERVIN ROMERO, and JONATHAN RIOS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>AXIS HOSPITALITY CONSTRUCTION, LLC; UPLAND HOSPITALITY GROUP LLC; VARGAS DEMO AND PAINT, LLC; JOSE VARGAS; and MELVIN AGUILAR,<br><br><br>*Defendants.* | Case No.: 1:24-cv-01764-AJT-IDD |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. BACKGROUND ...................................................................................................... 1

    A. Relevant Procedural History ....................................................................... 1

    B. The Parties and Their Work ........................................................................ 3

        1. Plaintiffs' Employment ................................................................... 3

        2. Defendants and Their Roles ............................................................ 4

        3. Axis' Subcontracts and Oversight .................................................. 5

    C. Knowledge of Nonpayment and Worker Complaints .................................. 6

III. LEGAL STANDARDS ............................................................................................ 12

    A. Default Judgment Standard ........................................................................ 12

    B. The Fair Labor Standards Act .................................................................... 13

        1. Overtime and Minimum Wage Requirements ............................... 13

        2. Joint Employment, Employee Status, and the Economic Realities Test ................................................................................................. 13

        3. Record-Keeping and Burden Shifting ........................................... 15

        4. Exemptions and Burden of Proof .................................................. 16

        5. Liquidated Damages and Good-Faith Defense .............................. 16

    C. Virginia Wage Laws .................................................................................. 17

        1. Virginia Wage Payment Act ......................................................... 17

        2. Virginia Overtime Wage Law ....................................................... 17

        3. Virginia Minimum Wage Act ....................................................... 18

        4. Construction Contracts and Contractor Liability ........................... 18

IV. SUBJECT MATTER AND PERSONAL JURISDICTION ...................................... 20

    A. Subject Matter Jurisdiction ........................................................................ 20

    B. Personal Jurisdiction and Service of Process .............................................. 20

V.     ARGUMENT ................................................................................................ 21

     A.     Liability for Unpaid Wages and Overtime.................................................. 22

     B.     The Defaulted Defendants Are Joint Employers ...................................... 23

     C.     No Exemption Applies................................................................................ 25

     D.     Damages: Unpaid Wages, Unpaid Overtime, Liquidated Damages, Treble Damages, Civil Monetary Penalties, and Prejudgment Interest ........................... 25

         1.     Unpaid Wages and Overtime.................................................... 25

         2.     FLSA Liquidated Damages....................................................... 26

         3.     Virginia Liquidated Damages and Treble Damages................. 27

         4.     Prejudgment Interest and Civil Monetary Penalties ................ 27

         5.     Plaintiffs' Damages Calculations............................................. 28

         6.     Attorneys' Fees and Costs ........................................................ 29

         7.     Entry of Default Judgment and Need for Hearing ................... 30

VI.     CONCLUSION........................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946) .................................................................................... 15, 16, 23

*Bmo Harris Bank N.A. v. Basnight*,
  2019 U.S. Dist. LEXIS 142400 (E.D. Va. Aug. 21, 2019) ............................... 13, 30

*Chavez-Deremer v. Med. Staffing of Am., Ltd. Liab. Co.*,
  2025 U.S. App. LEXIS 17726 (4th Cir. July 17, 2025) .................................... passim

*Conner v. Cleveland Cty.*,
  22 F.4th 412 (4th Cir. 2022) ................................................................................... 26

*Cornell v. Benedict*,
  301 Va. 342 (2022) ......................................................................................... 24, 29

*Dash v. Mayweather*,
  2010 U.S. Dist. LEXIS 87842 (D.S.C. Aug. 25, 2010) ........................................... 21

*E.M.D. Sales, Inc. v. Carrera*,
  604 U.S. 45 (2025) ...................................................................................... 16, 25

*Helix Energy Sols. Grp., Inc. v. Hewitt*,
  598 U.S. 39 (2023) ...................................................................................... 16, 25

*Herman v. RSR Sec. Servs. Ltd.*,
  172 F.3d 132 (2d Cir. 1999) ................................................................................... 24

*Hudson v. Dunn*,
  2024 U.S. Dist. LEXIS 102045 (E.D. Va. Mar. 15, 2024) ...................................... 20

*Kerr v. Marshall Univ. Bd. of Governors*,
  824 F.3d 62 (4th Cir. 2016) ................................................................................... 24

*McFeeley v. Jackson St. Entm't, LLC*,
  825 F.3d 235 (4th Cir. 2016) ................................................................................... 16

*Muratore v. Foster Aesthetics, L.L.C.*,
  2024 Va. Cir. LEXIS 117 (Cir. Ct. June 20, 2024) ................................................. 26

*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992) ................................................................................................ 22

*Ryan v. Homecomings Fin. Network*,
  253 F.3d 778 (4th Cir. 2001) ................................................................................... 13

*Salinas v. Commercial Interiors, Inc.*,
  848 F.3d 125 (4th Cir. 2017) ....................................................... 13, 14, 24

*Sierra Club v. Simkins Indus., Inc.*,
  847 F.2d 1109 (4th Cir. 1988) ............................................................. 28

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ................................................................... 16, 23

*Vara v. Skanska USA Bldg., Inc.*,
  2024 U.S. Dist. LEXIS 117032 (E.D. Va. May 31, 2024) ......................... 12

*Ward v. Va. Pool Servs., Inc.*,
  2024 U.S. Dist. LEXIS 169718 (E.D. Va. Aug. 23, 2024) ........................ 13

**Statutes**

28 U.S.C. § 1331 ............................................................................. 20

28 U.S.C. § 1367(a) ......................................................................... 20

29 U.S.C. § 201 ................................................................................ 1

29 U.S.C. § 203(d) ...................................................................... 13, 15

29 U.S.C. § 203(e)(1) ......................................................................... 15

29 U.S.C. § 203(g) ............................................................................ 15

29 U.S.C. § 207(a)(1) ................................................................. 13, 23, 26

29 U.S.C. § 211(c) ............................................................................ 15

29 U.S.C. § 216(b) ................................................................. 13, 20, 26, 29

29 U.S.C. § 216(c) ............................................................................ 16

Va. Code § 11-4.6 ..................................................................... 19, 20, 22

Va. Code § 11-4.6(A) ......................................................................... 19

Va. Code § 11-4.6(B)(1) ...................................................................... 19

Va. Code § 11-4.6(B)(2) ...................................................................... 19

Va. Code § 11-4.6(C)(1) ...................................................................... 19

Va. Code § 11-4.6(C)(2) ...................................................................... 19

Va. Code § 11-4.6(C)(4) .................................................................................... 19

Va. Code § 40.1-28.10 ...................................................................................... 18

Va. Code § 40.1-28.11 ...................................................................................... 18

Va. Code § 40.1-28.12 ................................................................................ 18, 26

Va. Code § 40.1-28.8 ........................................................................................ 18

Va. Code § 40.1-28.9 .................................................................................. 18, 23

Va. Code § 40.1-29 ........................................................................................... 17

Va. Code § 40.1-29(A) ................................................................. 17, 23, 27, 29

Va. Code § 40.1-29(C) ...................................................................................... 23

Va. Code § 40.1-29(G) ...................................................................................... 17

Va. Code § 40.1-29(H) ......................................................................... 17, 27, 28

Va. Code § 40.1-29(J) ................................................................................. passim

Va. Code § 40.1-29(K) ................................................................................ 17, 27

Va. Code § 40.1-29.2 .............................................................................. 18, 23, 26

Va. Code § 8.01-328.1(A) ................................................................................. 21

**Rules**

Fed. R. Civ. P. 4 ............................................................................................... 21

Fed. R. Civ. P. 4(e)(2)(B) ................................................................................ 21

Fed. R. Civ. P. 4(h)(1)(B) ................................................................................ 21

Fed. R. Civ. P. 55(b) ................................................................................... 12, 30

Fed. R. Civ. P. 55(b)(2) ........................................................................... 1, 13, 30

## I. <u>INTRODUCTION</u>

Named Plaintiffs Ana Perdomo Paz, Enrique Villaroel, Ervin Romero and Jonathan Rios, on their own behalf and on behalf of the opt-in Plaintiffs (collectively, "Plaintiffs"), by counsel and pursuant to Federal Rule of Civil Procedure 55(b)(2) and this Court's June 23, 2025 Order, Doc. 65, respectfully submit this memorandum in support of their motion for default judgment against defendants Upland Hospitality Group LLC ("Upland"), Vargas Demo and Paint LLC ("Vargas Demo"), Jose Vargas and Melvin Aguilar (collectively, the "Defaulted Defendants").[1]

This wage & hour collective action arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and Virginia's companion wage statutes. The Defaulted Defendants were properly served yet failed to answer. The Clerk has entered default, and Plaintiffs now seek judgment awarding unpaid straight-time and overtime wages, statutory liquidated and treble damages, prejudgment interest, civil penalties, attorneys' fees and costs. The record establishes liability and damages with mathematical certainty. Because the Defaulted Defendants have admitted the well-pleaded allegations of the complaint and have presented no evidence to dispute Plaintiffs' calculations, the Court should enter default judgment in the amounts requested.[2]

## II. <u>BACKGROUND</u>

### A. <u>Relevant Procedural History</u>

This Collective Action was filed on October 4, 2021, and amended as of right on January 29, 2025. Docs. 1, 22. The complaint alleges that Plaintiffs were employed on various Axis-

---

[1] As used in this memorandum, "Defaulted Defendants" refers to Upland, Vargas Demo, Jose Vargas and Melvin Aguilar. "Axis" refers to Defendant Axis Hospitality Construction, LLC, which has answered and against which litigation continues.

[2] Plaintiffs have filed contemporaneously herewith an accompanying Notice of Hearing pursuant to the Court's Order. Doc. 69. However, Plaintiffs have no objection to the Court ruling on the papers should it deem it appropriate to do so.

managed hotel renovation projects, regularly working 50–90 hours per week without receiving all earned wages and the required overtime premium for all overtime hours worked (hours worked over 40 each week). *See generally id.* Plaintiffs bring claims under the FLSA and Virginia state wage statutes—the Virginia Minimum Wage Act ("VMWA"), Virginia Wage Payment Act ("VWPA"), and Virginia Overtime Wage Act ("VOWA"). Doc. 22, First Am. Compl. at ¶ 2.

On December 3, 2024, Plaintiffs obtained service of the original Complaint, the Court-issued Summons, and all accompanying process on Upland in accordance with the Federal Rules, through private process service on Defendant's designated Virginia Registered Agent. Doc. 9. On December 10, 2024, Plaintiffs obtained service of the original Complaint, the Court-issued Summons, and all accompanying process on Vargas Demo in accordance with the Federal Rules, through private process service on Defendant's designated Texas Registered Agent. Doc. 10. On February 7, 2025, Plaintiffs obtained service of the Amended Complaint, the Court-issued Summons, and all accompanying process on Jose Vargas in accordance with the Federal Rules, through private process service on Defendant's ex-wife/co-resident at his Texas residence. Doc. 30. On March 19, 2025, Plaintiffs obtained service of the Amended Complaint, the Court-issued Summons, and all accompanying process on Melvin Aguilar in accordance with the Federal Rules, through private process service on Defendant at his Louisiana residence. Doc. 43.[3]

Pursuant to the Federal Rules, the Defaulted Defendants were required to file an Answer or other responsive pleading to Plaintiffs' Complaint within Twenty-One (21) days of the date Plaintiffs effectuated service of process. The Defaulted Defendants failed to Answer or otherwise respond to Plaintiffs' Complaint within the required Twenty-One (21) days.

On June 24, 2025 the Clerk entered default against them. Docs. 65–67. Litigation continues

---

[3] Plaintiffs have attached hereto their Civil Service Affidavit as Exhibit A for Jose Vargas and Melvin Aguilar (note—Mr. Vargas has a second last name "Perdomo"). *See* Exhibit A.

against Axis, the sole answering defendant. The Court granted final certification of a collective action on June 23, 2025. Doc. 64. That same day, the Court ordered Plaintiffs to file a motion for default judgment against the Defaulted Defendants and to "file a Notice setting a hearing" on the motion. Doc. 65. Accordingly, Plaintiffs now seek default judgment against the Defaulted Defendants on the claims asserted in the amended complaint.

**B.** **The Parties and Their Work**

1. <u>Plaintiffs' Employment</u>

Plaintiffs were employed as hourly laborers performing demolition, drywall installation, painting, furniture installation, cleaning, and related tasks on three hotel renovation projects in Virginia: the Marriott Westfields Dulles project in Chantilly ("Dulles Project"), the Marriott Courtyard in Charlottesville ("Charlottesville Project"), and the Residence Inn in Manassas ("Manassas Project"). *See* Doc. 22, First Am. Compl. ¶ 37; Doc. 72-1, Pls.' Decls. ¶¶ 1–3; Doc. 56-1, Kingsley Aff. ¶¶ 3–6; Doc. 48-1, Kingsley Dep. at 23:5–29:3, 41:21–42:8.

Plaintiffs routinely worked six or seven days per week in 10–12-hour shifts and were paid hourly. *See* Doc. 22, First Am. Compl. ¶¶ 54–55; Doc. 72-1, Pls.' Decls. ¶¶ 4–6. Despite working between 50 and 90 hours per week, Defendants did not compensate Plaintiffs for all hours worked and never paid the required premium overtime rate of one-and-one-half times Plaintiffs' regular rate for hours worked over forty each week. *See* Doc. 22, First Am. Compl. ¶¶ 56–57; Doc. 72-1, Pls.' Decls. ¶¶ 4–6. The Defaulted Defendants knowingly and willfully failed to pay these wages. *See* Doc. 22, First Am. Compl., ¶¶ 82, 102, 111, 120.

At all times relevant, each Plaintiff had an agreed upon wage rate for each hour of work that they performed. Doc. 22, First Am. Compl. at ¶ 42. At all relevant times, Plaintiffs were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207. Doc. 22, First Am. Compl. at ¶ 18. The Defaulted Defendants

compensated Plaintiffs on an hourly basis and classified them as non-exempt under the FLSA. Doc. 22, First Am. Compl. at ¶ 54.

### 2. Defendants and Their Roles

Axis is an Ohio limited liability company headquartered in Gahanna, Ohio. *See* Doc. 56-1, Kingsley Aff. ¶ 2. Upland is a Georgia limited liability company with its principal place of business in Alpharetta, Georgia. Vargas Demo is a Texas limited liability company headquartered in Austin, Texas. *See* Doc. 22, First Am. Compl. ¶¶ 23–24. Axis subcontracted renovation work on the Virginia projects to Upland, which in turn subcontracted portions of the work to Vargas Demo. *See* Doc. 28, Axis Answer ¶ 1; Doc. 56-1, Kingsley Aff. ¶¶ 15–17. Mr. Ricardo Sablon is an owner of Upland, and Defendants Jose Vargas and Melvin Aguilar own or manage Vargas Demo and Upland, respectively. *See id.*; Doc. 22, First Am. Compl. ¶¶ 25–27.

Axis employed only superintendents and assistant superintendents (also called "supervisors") on the project sites. Doc. 48-1, Kingsley Dep. at 23:5–29:3, 41:21–42:8; Doc. 48-2, Valentich Dep. 20:18–26:19; Doc. 72-2, Sanchez Dep. 17:1–41:8. These superintendents resided on site, oversaw subcontractor work, recorded worker hours, coordinated material deliveries and enforced Axis' safety policies. Doc. 56-1, Kingsley Aff. ¶ 11; Doc. 48-1, Kingsley Dep. at 23:5–29:3, 41:21–42:8; Doc. 48-2, Valentich Dep. 20:18–26:19; Doc. 72-2, Sanchez Dep. 17:1–41:8. Messrs. Kevin Valentich, Luis Sanchez, Jr., and Estreberto Carcamo served as Axis superintendents on the Dulles Project, inspecting subcontractor progress, assigning work, reporting hours and enforcing safety rules, with Mr. Valentich serving as the lead superintendent on the project. Doc. 56-1, Kingsley Aff. ¶ 11; Doc. 48-1, Kingsley Dep. at 23:5–29:3, 41:21–42:8; Doc. 48-2, Valentich Dep. 20:18–26:19; Doc. 72-2, Sanchez Dep. 17:1–41:8.

At all relevant times, the Defaulted Defendants were an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in

that said enterprise has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000. Doc. 22, First Am. Compl. at ¶ 19.

### 3.      Axis' Subcontracts and Oversight

Axis entered into multiple subcontracts with Upland. On 25 July 2022 Axis subcontracted exterior work for the Manassas Project for $136,197.10 with a 10% retainage. *See* Doc. 48-4, Residence Inn by Marriott Manassas Exterior Subcontractor Agreement at 3.[4] Axis' prime contract for the Dulles Project was executed on August 16, 2022, reflecting a contract amount of $3,539,840.00. *See* Doc.48-6, Dulles Project Prime Contract at 2; Doc. 56-1, Kingsley Aff. ¶ 3. Axis thereafter subcontracted work on that project to Upland on August 30, 2022, for $2,357,379.00 plus a 10% retainage. *See* Doc. 48-3, Dulles Project Subcontract at 3, 9. On December 6, 2022, Axis and Upland executed an interior-work subcontract for the Manassas Project valued at $384,479.40, also with a 10% retainage. *See* Doc. 48-5, Manassas Project Interior Subcontract at 3.

Each subcontract required Upland to perform the work "under the general direction of" Axis; to maintain an experienced English-speaking superintendent or foreman "with authority to carry out directives of" Axis; to either submit its own safety plan to Axis or abide by Axis' Safety Policies and Procedures plan; and to procure workers' compensation, employer's liability and commercial general liability insurance naming Axis as an additional insured. *See* Docs. 48-3, Dulles Project Subcontract at 3–4, 8, 17–36; 48-4, Manassas Project Exterior Subcontract at 3–4,

---

[4] For the Court's convenience, all page numbers for previous docket entries/filings reflected herein are to the ECF-stamped page numbers, unless otherwise indicated.

8, 16–31; 48-5, Manassas Project Interior Subcontract at 3–4, 8, 15–35.

Axis superintendents exercised significant control over the projects. They enforced safety policies, issued disciplinary warnings, coordinated deliveries, and recorded worker hours using Upland time sheets. *See* Doc. 56-1, Kingsley Aff. ¶ 11; Doc. 48-2, Valentich Dep. at 78:17–86:1, 115:20–119:21; Doc. 72-2, Sanchez Dep. 31:6–17. They inspected subcontractor work, determined whether tasks were completed satisfactorily and communicated directly with subcontractor management regarding performance and payment issues. *See* Doc. 56-1, Kingsley Aff. ¶ 11; Doc. 48-1, Kingsley Dep. at 23:5–29:3, 41:21–42:8; Doc. 48-2, Valentich Dep. at 20:18–26:19, 78:17–86:1, 115:20–119:21; Doc. 72-2, Sanchez Dep. 17:1–41:8.

Opt-in Plaintiff Griselda Aguilar—who is the daughter of Defendant Melvin Aguilar—was the only employee responsible for completing and maintaining timesheets, including recording subcontractor workers' time worked, during her employment on the Dulles Project. *See* Doc. 48–7, Declaration of Griselda Aguilar ("First Aguilar Decl."), at ¶¶ 1–7; Doc. 72-4, Paz Dep. at 45:8–19. Plaintiff Aguilar recorded every hourly worker's daily hours, emailed those timesheets to Upland's payroll team, and stayed on site as late as the last worker to ensure accuracy. *See id.* Additionally, Messrs. Sanchez and Carcamo instructed Plaintiff Aguilar to record hours worked for various workers on paper timesheets, text the completed timesheets to them, and asked her to report worker headcounts—after which Mr. Sanchez photographed the timesheets. *See id.*

In May 2023, Mr. Carcamo solicited from Plaintiff Aguilar and other hourly workers the number of weeks they went unpaid and promised to investigate—but no action or follow-up was ever taken. *See* Doc. 48–7, First Aguilar Decl., at ¶ 10.

C.     **Knowledge of Nonpayment and Worker Complaints**

Axis' superintendents and principals repeatedly learned that workers were not being paid. Assistant superintendent Carcamo testified that he heard workers on the Dulles project "talking

6

about [not] getting paid" and relayed those complaints to lead superintendent Valentich and fellow assistant superintendent Sanchez. *See* Exhibit C, Transcript of Deposition of Estreberto Carcamo ("Carcamo Dep."), at 86:5–89:22. Lead superintendent Valentich likewise testified that his assistants Mr. Sanchez and Mr. Carcamo told him there were "rumblings" that workers were not getting paid and threatening to possibly stop work due to the non-payment; Mr. Valentich called to report these complaints to Axis project manager Doug Kasberg and to Upland owner Ricardo Sablon, during which Mr. Valentich warned that workers were "going to start . . . stopping work" unless paid; Mr. Valentich then recalls Mr. Sablon saying he would "take care of it." *See* Doc. 48-2, Valentich Dep. at 151:2:17–162:1. After the call Mr. Valentich "Left it at that" because Mr. Sablon said "he'd take care of it." *See id.*

Plaintiff Paz likewise testified that she and her co-workers repeatedly complained to Axis superintendent Luis Sanchez when Upland failed to pay them. *See* Doc. 72-4, Paz Dep. at 33:15–36:1. Plaintiff Villaroel testified that workers complained directly to Upland supervisors Melvin Aguilar and Jose Vargas about being owed two to five weeks of wages and that, during a March 10, 2023, conference call with about sixty workers and Upland owner Ricardo Sablon, he and others demanded payment. *See* Doc. 72-5, Villaroel Dep. at 69:14–75:12.[5]

Axis' senior leadership was also aware of the nonpayment. Joel Kingsley, Axis' president, testified that a hotel owner representative told him that a Latino labor union had complained that workers were not getting paid; Mr. Kingsley called Mr. Sablon and said the client claimed he was not paying his workers, and Mr. Sablon admitted he was having cash-flow problems and "steal[ing] from Peter to pay Paul." *See* Doc. 48-1, Kingsley Dep. 59:5–73:7. Mr. Kingsley retained counsel and, after negotiations with the Laborers' International Union of North America

---

[5] Plaintiffs note for the Court that there is an error in the transcript for Named Plaintiff Villaroel's deposition—it is erroneously labeled as Named Plaintiff Rios' deposition.

("LiUNA"), used money retained from Upland under the subcontract to make restitution payments to workers (including from both Upland and Vargas Demo); Mr. Kingsley testified that Axis issued "restitution" checks directly to the unpaid workers with the withheld funds. *See id.* Mr. Kingsley approximates he first learned of these wage payment issues in June 2023. *See* Doc. 48-1, Kingsley Dep. at 59:8–65:18. Additionally, during the pendency of the Dulles Project, Upland changed its name to R&R Hotel Group LLC amid "financial troubles" and cash-flow issues, as Mr. Sablon explained he was "doing a lot of insurance work . . . and he was having troubles collecting money." *See* Doc. 48-1, Kingsley Dep. at 57:17–59:4.

Mr. Valentich also spoke twice with unidentified union representatives from the LiUNA union during the pendency of the Dulles Project, which represented a number of subcontractor workers on the project to recover unpaid wages—first in the parking lot and then in the hotel lobby—directing both to leave the hotel premises and telling them that Axis "pay[s] a subcontractor, [Mr. Sablon]" and "we have no idea what [Mr. Sablon] does with the checks after he gets them." Further, Mr. Valentich had hotel management ask one of the union representatives to leave the hotel lobby. Mr. Valentich kept the hotel's general manager, Derwin Swann, apprised of events, and informed Axis leadership and a representative of the hotel owner—Mr. Kingsley and Mr. Pacewark—of the situation. *See* Doc. 48-2, Valentich Dep. at 162:2–167:12. As part of the LiUNA settlement, Mr. Valentich personally helped distribute restitution checks to Dulles workers; he acknowledged that workers had to provide identification and signed Forms W-9 and that the checks were intended to compensate them for unpaid wages; Mr. Sanchez assisted with this process, and union representatives remained nearby. *See* Docs. 48-1, Kingsley Dep. at 65:15–73:7, 91:9–92:19; Doc. 48-2, Valentich Dep. at 178:12–182:12.

Mr. Valentich observed that, at peak, 80–100 subcontractor workers staffed the Dulles

Project, tapering to 40–50 during finish-out and down to 20–30 as guest-room work wound down, all working seven days a week under Axis-mandated "noise" hours of 9 a.m.–5 p.m. (quiet work permitted 8–9 a.m. and after 5 p.m.). Lunch breaks occurred around 11:30 a.m.–12:00 p.m., with informal additional breaks as needed. *See* Doc. 48-2, Valentich Dep. at 168:2–171:22.

Additional testimony further illustrates the breadth of the wage violations. Plaintiff Paz testified that Upland stopped paying workers around August 2023 and that she personally was owed approximately eight weeks of wages; she also explained that Defendant Jose Vargas sometimes paid her in cash via a coworker. *See* Doc. 72-4, Paz Dep. at 33:15–36:1. Plaintiff Romero recounted that workers were required to sign a letter falsely stating that they had been paid in full in order to receive two checks; he signed under duress and later learned that the checks lacked sufficient funds and were either returned or declined. *See* Doc. 72-6, Romero Dep. at 57:13– 66:12. Plaintiff Rios testified that Upland paid workers only straight time for all hours worked and never paid the overtime premium; he estimated that he went unpaid for approximately four weeks on the Dulles project and recounted that he and co-workers asked Axis supervisors Messrs. Sanchez and Carcamo to help them secure payment because Upland told them Axis had not paid Upland. *See* Doc. 72-7, Rios Dep. at 27:12–29:3, 38:16–47:1, 58:19–69:21. Plaintiff Villaroel likewise testified that after a March 10 2023 conference call in which he and other workers complained to Upland owner Ricardo Sablon about unpaid wages, he was pulled off the Dulles project and transferred to Charlottesville. *See* Doc. 72-5, Villaroel Dep. at 69:14–75:12.

On July 22, 2023, Upland's owner, Mr. Sablon, and manager, Jorge Nunez, held an all-hands meeting at the Dulles Project site, threatened workers with bankruptcy and withholding of wages unless they signed an agreement, and presented two payroll checks—one immediately negotiable and one pending—that ultimately bounced for lack of funds. Shortly thereafter, Axis

supervisors replaced many original hourly employees with new workers—citing "legal status" and the existing nonpayment issues. *See* Doc. 48–7, First Aguilar Decl., at ¶¶ 11–16.

From personally speaking with, observing, and working alongside other hourly employees at the Dulles Project, Ms. Aguilar knows that most, if not all, other hourly employees were not paid proper overtime compensation for all overtime hours worked, were not paid all of their regular earned wages, and were required to sign the above-described "release" agreement as a condition of continued employment. *See* Doc. 48–7, First Aguilar Decl., at ¶¶ 26–27.

Plaintiffs confirm they were hourly workers on Axis projects in Virginia and never received any overtime premium (1.5 times their regular rate for all hours worked over 40 each week) for their overtime hours worked throughout their entire employment with Defendants, regardless of their varying hourly rates (varying from \$16–\$24 per hour) and average weekly hours worked (varying from 50–90 hours per week). *See generally* Doc. 72-1, Pls.' Decls.

The table below provides summary information from Plaintiffs' declarations, including: (1) name of each Plaintiff; (2) job role; (3) projects worked on and dates of employment for each project; (4) assigned hourly rates; (5) average hours worked per week; (6) number of weeks not paid overtime premiums; and (7) number of weeks not paid any wages, including straight time and overtime premiums:

| Plaintiff | Role | Projects Worked and Dates of Employment | Hourly Rate | Average Hours Worked Per Week | # of Weeks No OT Paid | # of Weeks No Wages Paid |
|---|---|---|---|---|---|---|
| Ana Perdomo Paz | Cleaner | Dulles, Jan 2023– Aug 2023 | \$18.00 | 50–70 | 34 | 8 |
| Ervin Romero | Skilled Worker | Dulles, Jan 2023– Aug 2023 | \$20.00 | 70–80 | 30 | 5 |
| Enrique Villaroel | Drywall Installer | Dulles, Jan 2023– Mar 2023; | \$20.00 | 60–70 | 8 | 5 + 3 days |

| | | Charlottesville, Mar 2023 (3 days) | | | | |
|---|---|---|---|---|---|---|
| Jonathan Rios | Painter Drywall Furniture Mover | Charlottesville, Apr 2022–Jan 2023; Dulles, Feb 2023–Oct 2023 | $22.00 | 60–80 | 73 | 6 |
| Griselda Aguilar | Painter Cleaner Timesheet Custodian | Dulles, Jan 2023–Aug 2023 | $20.00 | 66–82 | 32 | 6 |
| Careglis Rios | Painter | Dulles, Jan 2023–Aug 2023 | $20.00 | 70–80 | 32 | 3 |
| Carlos Garcia Perez | Painter Drywall Installer | Dulles, Jan 2023–Aug 2023 | $20.00 | 80–90 | 32 | 8 |
| Julio Alfonzo Castellanos | Supervisor | Dulles, Jan 2023–Aug 2023 | $24.00 | 70–80 | 32 | 4 |
| Walter Castellanos | Painter Finisher | Dulles, Jun 2023–Aug 2023 | $23.00 | 60–70 | 12 | 3 |
| Hector Lopez Montoya | Furniture Builder | Dulles, Feb 2023–Sep 2023 | $21.00 | 70-80 | 30 | 4 |
| Noel Saral Aguilar | Furniture Builder | Dulles, Jan 2023–Sep 2023 | $22.00 | 50–70 | 34 | 6 |
| Guadalupe Jimenez | Cleaner | Dulles, Jan 2023–Aug 2023 | $16.00 | 50–65 | 30 | 5 |
| Hector Alexis Barahona | Painter Drywall Installer | Manassas, Nov 2022–Jan 2023; Dulles, Jan 2023–Aug 2023 | $20.00 | 60–72 | 38 | 8 |
| Helin Castro | Painter | Charlottesville, Jan. 2022–Dec 2022; Dulles, Jan 2023–Aug 2023 | $18.00 | 70-80 | 84 | 8 |
| Karen Berrios | Painter | Manassas, Nov 2022–Jan 2023; Dulles, Jan 2023–Aug 2023 | $18.00 | 70–80 | 30 | 4 |
| Julio Armando Castellanos | Painter Finisher | Dulles, Apr 2023–Aug 2023 | $23.00 | 68–70 | 17 | 5 |
| Mariozi Perez | Painter | Dulles, Jul 2023–Aug 2023 | $20.00 | 65–75 | 4 | 3 + 3 days |

| Wilder Hernandez Torres | Drywall Painter Furniture Mover | Dulles, Jan 2023– Aug 2023 | $20.00 | 65–70 | 32 | 8 |
|---|---|---|---|---|---|---|
| Brengie Stephania Rios | Painter | Dulles, Feb 2023– Aug 2023 | $20.00 | 60–70 | 25 | 4 |

*See generally* Doc. 72-1, Pls.' Decls. Plaintiffs' damages calculations, derived from the information in their declarations, is attached hereto as Exhibit B.

Plaintiffs now seek Default Judgment against the Defaulted Defendant in the amount of: (i) Plaintiff's earned and unpaid wages, including, unpaid regular and overtime wages; (ii) statutory liquidated damages; (iii) statutory treble damages; (iv) statutory prejudgment interest; (v) statutory civil monetary penalties; and (vi) reasonable attorneys' fees and costs.[6]

## III.  <u>LEGAL STANDARDS</u>

### A.  <u>Default Judgment Standard</u>

Federal Rule of Civil Procedure 55(b) provides for entry of default judgment when a defendant has failed to plead or otherwise defend the action. Once default is entered, the defaulting defendant admits the well-pleaded factual allegations of the complaint; however, the court must determine whether those allegations state a valid claim for relief and must independently determine damages. *See Vara v. Skanska USA Bldg., Inc.*, Civil Action No. 1:22-cv-1180 MSN/IDD, 2024 U.S. Dist. LEXIS 117032, at *12 (E.D. Va. May 31, 2024) (I.D. Davis, M.J.). In the Fourth Circuit, a defaulting defendant admits only the complaint's factual allegations, not legal conclusions. *See Ward v. Va. Pool Servs., Inc.*, Civil Action No. 1:24-cv-00701 (AJT/WBP), 2024 U.S. Dist. LEXIS

---

[6] Due to the ongoing litigation against Axis, and pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), should the Court grant Plaintiffs' Motion for Default Judgment, Plaintiffs respectfully request the Court to allow Plaintiffs to file a Petition for Attorneys' Fees and Costs within fourteen (14) days after judgment has been entered against all Defendants (including, but not limited to, Axis).

169718, at *5 (E.D. Va. Aug. 23, 2024) (Porter, M.J.). The court must evaluate the sufficiency of the pleadings and may rely on affidavits and documentary evidence to fix damages without an evidentiary hearing when the amount is for a sum certain or can be ascertained by mere computation. *See, e.g.*, *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780–81 (4th Cir. 2001) (defaulting defendant admits well-pleaded allegations but plaintiff must still establish entitlement to relief); *Bmo Harris Bank N.A. v. Basnight*, No. 2:19cv14, 2019 U.S. Dist. LEXIS 142400, at *4 (E.D. Va. Aug. 21, 2019) ("To assess the extent of a plaintiff's damages, a district court may conduct an evidentiary hearing under Rule 55(b)(2), but it need not do so if the damages can be ascertained based on detailed affidavits or documents attached to the plaintiff's motion." (cleaned up)) (M.S. Davis, M.J.).

### B. The Fair Labor Standards Act

#### 1. Overtime and Minimum Wage Requirements

The FLSA requires employers to pay non-exempt employees a minimum wage for all hours worked and to pay overtime compensation at one-and-one-half times the regular rate for hours worked in excess of forty in a workweek. *See* 29 U.S.C. § 207(a)(1). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Employers who violate these requirements are liable to the employees for the unpaid wages, an "additional equal amount as liquidated damages," and reasonable attorneys' fees and costs. 29 U.S.C. § 216(b).

#### 2. Joint Employment, Employee Status, and the Economic Realities Test

An entity or individual can be a joint employer under the FLSA when it exercises operational/functional control over the terms and conditions of the employees' work. *See Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 141–47 (4th Cir. 2017). The Fourth Circuit applies a

two-step inquiry to guide this analysis: (1) whether the putative joint employers are not completely disassociated with respect to the employment of a worker; and (2) if not, whether the worker is an employee protected by the FLSA in the context of the worker's entire employment, or an independent contractor outside the statute's scope. *See id.*

The Fourth Circuit in *Salinas* adopted six non-exclusive factors to guide the analysis of the first step of this test, including:

(1) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to direct, control, or supervise the worker, whether by direct or indirect means;

(2) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate the power to—directly or indirectly—hire or fire the worker or modify the terms or conditions of the worker's employment;

(3) The degree of permanency and duration of the relationship between the putative joint employers;

(4) Whether, through shared management or a direct or indirect ownership interest, one putative joint employer controls, is controlled by, or is under common control with the other putative joint employer;

(5) Whether the work is performed on a premises owned or controlled by one or more of the putative joint employers, independently or in connection with one another; and

(6) Whether, formally or as a matter of practice, the putative joint employers jointly determine, share, or allocate responsibility over functions ordinarily carried out by an employer, such as handling payroll; providing workers' compensation insurance; paying payroll taxes; or providing the facilities, equipment, tools, or materials necessary to complete the work.

*Id.* at 141-42. Critically, "one factor alone can serve as the basis for finding that two or more persons or entities are 'not completely disassociated' with respect to a worker's employment if the facts supporting that factor demonstrate that the person or entity has a substantial role in determining the essential terms and conditions of a worker's employment." *Id.* at 142.

As for the second step, the FLSA's protections apply only to "employees," but Congress

defined that term broadly to encompass "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Act similarly defines "employ" to mean "suffer or permit to work," *id.* § 203(g), and "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* § 203(d). Because the FLSA is remedial legislation intended to protect workers who are economically dependent on a business, courts look beyond contractual labels to the economic reality of the relationship when determining whether a worker is an employee or an independent contractor. *See Chavez-Deremer v. Med. Staffing of Am., Ltd. Liab. Co.*, Nos. 23-2176, 23-2284, 2025 U.S. App. LEXIS 17726 at *36–38 (4th Cir. July 17, 2025).

The Fourth Circuit evaluates six factors—often called the "*Silk* factors"—in making that determination: (1) the degree of control the putative employer exercises over how the work is performed; (2) the worker's opportunity for profit or loss depending on managerial skill; (3) the worker's investment in equipment or employment of others; (4) the skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the work is an integral part of the employer's business. *Id.* No single factor is dispositive; instead, courts consider the totality of the circumstances to determine whether the worker is economically dependent on the business to which he renders service. *Id.* Under this test, misclassified independent contractors are still "employees" entitled to minimum wage, overtime pay and liquidated damages. *See id.*; *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946). (explaining that employees may use a just and reasonable inference of hours worked when the employer fails to keep records).

3. <u>Record-Keeping and Burden Shifting</u>

Under 29 U.S.C. § 211(c), employers are required to maintain accurate payroll records. When an employer fails to keep adequate records, employees need only prove that they performed work for which they were not properly compensated and produce sufficient evidence to show the

amount and extent of that work as a matter of just and reasonable inference; the burden then shifts to the employer to produce evidence of the precise amount of work or to negate the inference. *See Anderson*, 328 U.S. at 687–88. The Supreme Court has held that representative or statistical evidence may be used to establish damages when each employee could have relied on that evidence if he or she had proceeded individually and the employer failed to keep adequate records. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454–58 (2016).

    4.  <u>Exemptions and Burden of Proof</u>

  The employer bears the burden of proving that an employee falls within a FLSA exemption by a preponderance of the evidence. *See E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 52 (2025). Moreover, payment on an hourly basis does not satisfy the salary-basis requirement of the executive, administrative or professional exemptions; workers paid an hourly rate remain entitled to overtime regardless of their high earnings. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 61 (2023). Here, Plaintiffs were paid hourly for manual labor and are unquestionably non-exempt.

    5.  <u>Liquidated Damages and Good-Faith Defense</u>

  "The FLSA is unambiguous: An employer that violates the Act's overtime provisions is liable not only for unpaid overtime wages but also for 'an additional equal amount as liquidated damages.'" *See Med. Staffing*, 2025 U.S. App. LEXIS 17726, at *70 (quoting 29 U.S.C. § 216(c)). "The good faith provision exists not just to make employees whole, but also to deter employers from gambling on noncompliance—that is, as we have said, from 'rolling the dice by underpaying employees, reasoning all the while that it would be no worse off even if the employees eventually prevailed in court.' . . . The good faith provision is designed to make such a strategy a losing bet." *Id.* at *71 (quoting *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 245 (4th Cir. 2016)).

  Liquidated damages are thus mandatory under the FLSA unless the employer establishes

that it (1) acted in good faith, _and_ (2) had objectively reasonable grounds for believing its actions were lawful. _See id._ at \*71-73. The employer carries a "plain and substantial" burden to prove good faith; ignorance of the law or mere lack of bad intent does not suffice. _See id._ "Indeed, if mere assumption amounted to good faith and reasonable belief of compliance, no employer would have any incentive to educate itself and proactively conform to the FLSA." _Id._ at \*72 (cleaned up).

C.      **Virginia Wage Laws**

Virginia law supplements the FLSA through several statutes that guarantee payment of wages, overtime and minimum wages and provide robust remedies for violations.

1.      Virginia Wage Payment Act

The VWPA requires employers to pay all wages due on the next regular pay period, requires written and signed authorization from employees for any extralegal withholdings from pay, and imposes strict remedies for violations, among other provisions. _See_ Va. Code §§ 40.1-29 _et seq_. An employer who fails to pay wages is liable for the wages due, plus an equal amount as liquidated damages and eight-percent prejudgment interest. Va. Code § 40.1-29(J). For "knowing" violations—defined as a defendant having actual knowledge of the violation, acting in deliberate ignorance of whether it was paying wages owed or acting in reckless disregard of that obligation— courts must award treble damages and reasonable attorneys' fees. _Id._ § 40.1-29(K). The statute also authorizes a $1,000 civil monetary penalty for each knowing violation of Subsection A of the VWPA (i.e., each pay period the employer failed to pay all earned wages). _Id._ § 40.1-29(H). Prejudgment interest accrues at eight percent per annum. _Id._ §§ 40.1-29(J), (G).

2.      Virginia Overtime Wage Law

The VOWA provides that any employer who violates the overtime pay requirements of the federal FLSA "shall be liable to the employee for the applicable remedies, damages, or other relief available under the federal [FLSA]" in an action brought pursuant to the VWPA. Va. Code § 40.1-

29.2. The statute specifies that the terms "employer" and "employee" have the same meanings as under the FLSA and that FLSA exemptions, overtime calculation methods, methods of payment and limitations periods apply. *See id.* Thus, a failure to pay overtime that violates the FLSA also violates Virginia law and subjects the employer to the same remedies through the VWPA.

   3.  Virginia Minimum Wage Act

The VMWA is a companion to the FLSA. The statute declares that the article "shall be known as the Virginia Minimum Wage Act," Va. Code § 40.1-28.8, and requires employers to pay employees at least the greater of the state or federal minimum wage. *See* Va. Code §§ 40.1-28.9, 40.1-28.10. Pursuant to the VMWA, the minimum wage was $12.00 per hour through December 31, 2024, and is now adjusted annually for inflation after January 1, 2025. *See* Va. Code § 40.1-28.10. According to the Virginia Department of Labor and Industry, the minimum wage for the 2025 calendar year is $12.41 per hour and will be raised to $12.77 effective January 1, 2026.[7]

Employers who violate these requirements are liable for the unpaid minimum wages plus eight-percent interest from the date the wages were due and may be required to pay employees' reasonable attorneys' fees. *See* Va. Code § 40.1-28.12. The VMWA also provides for statutory penalties for knowing violations: any person who knowingly and intentionally violates the Act may be fined between $10 and $200. *See* Va. Code § 40.1-28.11. Like the VWPA, the VMWA thus provides an additional avenue for recovery when an employer fails to pay workers for all hours worked and thereby reduces their hourly wage below the statutory minimum.

   4.  Construction Contracts and Contractor Liability

Virginia law recognizes that wage theft can occur on construction projects when owners

---

[7] *See Virginia Minimum Wage Rate Increasing Effective January 1, 2026*, Va. Dep't of Labor & Indus. (July 28, 2025), https://doli.virginia.gov/virginia-minimum-wage-rate-increasing-effective-january-1-2026/ (last visited Aug. 4, 2025).

and contractors delegate payment responsibilities to lower-tier subcontractors. To address this problem, Va. Code § 11-4.6 requires prompt-payment clauses in private construction contracts and imposes joint and several wage liability on higher-tier contractors.

The statute defines a "construction contract" as any contract for the construction, alteration, repair, or maintenance of a building or structure and incorporates definitions of "contractor," "general contractor," and "owner" from other statutes. *See id.* § 11-4.6(A). Owners must pay general contractors within 60 days of receiving an invoice and must notify the general contractor within 45 days if they intend to withhold payment. *See id.* § 11-4.6(B)(1). General contractors must in turn pay subcontractors within 60 days of the subcontractor's invoice or within seven days of receiving payment from the owner. *See id.* § 11-4.6(B)(2). Any provision conditioning payment to a subcontractor on the general contractor's receipt of payment from the owner is unenforceable, and untimely payments accrue interest penalties. *See id.* § 11-4.6(B)(2).

Subsection (C) requires that contracts executed after July 1, 2020, "shall be deemed to include" a term making the general contractor, its subcontractor and any lower-tier subcontractors jointly and severally liable to pay employees of a lower-tier subcontractor the wages due under their employment agreements or the amounts required by the VMWA and the federal FLSA. *See id.* § 11-4.6(C)(1). The statute expressly deems the general contractor to be the employer of the subcontractor's employees for purposes of the VWPA and makes the general contractor jointly and severally liable with the subcontractor for unpaid wages and all associated penalties. *See id.* § 11-4.6(C)(2). Liability is triggered when the general contractor knows or should know that a subcontractor is not paying employees, and it applies only to non–single-family projects valued at more than $500,000. *See id.* § 11-4.6(C)(4).

By incorporating these provisions, Virginia ensures that workers on large construction

projects have recourse against both the subcontractor who hired them and the higher-tier contractor who benefits from their labor. Courts applying § 11-4.6 have held that it renders general contractors jointly and severally liable for all wages owed to subcontractor employees and that it makes the general contractor an "employer" for purposes of the VWPA, thereby subjecting the general contractor to liquidated damages, treble damages, attorneys' fee liability, among other remedies and penalties. *See Hudson v. Dunn*, Civil Action No. 1:23-cv-781 (RDA/WBP), 2024 U.S. Dist. LEXIS 102045, at \*32-33 (E.D. Va. Mar. 15, 2024) (Porter, M.J.) (finding that § 11-4.6 makes general contractors jointly and severally liable to pay subcontractors' employees the greater of the wages due or the amounts required by the FLSA and Virginia wage statutes and deeming general contractors employers for purposes of the VWPA).

## IV.   SUBJECT MATTER AND PERSONAL JURISDICTION.

The Court's June 23, 2025, Order directs Plaintiffs to demonstrate that the Court has both subject matter and personal jurisdiction over the Defaulted Defendants, and that service of process was proper. Doc. 65. Each requirement is satisfied here.

### A.   Subject Matter Jurisdiction

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because of Plaintiffs' claims arising under the federal FLSA. *See* 29 U.S.C. § 216(b) (authorizing private actions to recover unpaid wages and overtime). The Court also has supplemental jurisdiction over Plaintiffs' Virginia wage claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal FLSA claim—they stem from the same course of conduct relating to the failure to pay wages on the Virginia hotel projects. Accordingly, the Court has original and/or supplemental jurisdiction over all of Plaintiffs' claims.

### B.   Personal Jurisdiction and Service of Process

The Court likewise has personal jurisdiction over the Defaulted Defendants. Each

Defaulted Defendant purposefully availed themselves of the privilege of conducting business in Virginia: they entered into contracts to renovate hotels located in Virginia, sent workers into Virginia, supervised those workers, and benefitted from Plaintiffs' labor performed in Virginia. The wage violations alleged in the amended complaint arise directly from those Virginia activities. Exercising jurisdiction over the Defaulted Defendants therefore comports with Virginia's long-arm statute, Va. Code § 8.01-328.1(A), and due process. *See Dash v. Mayweather*, No. 3:10-1036-JFA, 2010 U.S. Dist. LEXIS 87842, at *5 (D.S.C. Aug. 25, 2010) ("If the defendant's contacts with the forum give rise to the basis of the suit, those contacts may provide the basis to establish what is referred to as specific jurisdiction.").

Service of process was proper under Federal Rule of Civil Procedure 4. Plaintiffs served Upland with the summons and amended complaint on December 3, 2024 by delivering them to the company's Virginia registered agent through a private process server, which is authorized by Rule 4(h)(1)(B). Doc. 9. Plaintiffs served Vargas Demo on December 10, 2024 in the same manner via its Texas registered agent. Doc. 10. Jose Vargas was served at his Texas residence on February 7, 2025 when a private process server left copies of the summons and complaint with Vargas's ex-wife, who resided with him at the time; substitute service on a co-resident of suitable age is permitted by Rule 4(e)(2)(B). Doc. 30; *see* Fed. R. Civ. P. 4(e)(2)(B) (authorizing service by "leaving a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there"). Melvin Aguilar was personally served at his Louisiana residence on March 19, 2025. Docs. 43.

Because each Defaulted Defendant was properly served and failed to appear or answer, the Court has personal jurisdiction over them and may proceed to enter judgment by default.

## V.     **<u>ARGUMENT</u>**

Both the allegations in the Amended Complaint, Doc. 22, and evidence in the record clearly

establish that Plaintiffs were not paid *any* overtime premiums, as well as *all* regular wages for certain weeks, during their work on the Dulles, Manassas, and Charlottesville Projects. Further, the Defaulted Defendants are deemed joint employers of Plaintiffs and are thus jointly and severally liable to Plaintiffs.

Congress enacted the FLSA in 1938 "to combat the pervasive 'evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health.'" *Med. Staffing*, 2025 U.S. App. LEXIS 17726, at *3 (4th Cir. July 17, 2025). To effectuate that remedial purpose, the FLSA's "striking breadth" of its "definitions serve to place under the 'employee' umbrella even those American workers 'who might not qualify as [employees] under a strict application of traditional agency law principles.'" *Id.* at *4 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

The Defaulted Defendants had actual and constructive notice through multiple channels— "rumblings," union complaints, conference calls, and onsite reports of unpaid wages. Yet they took no meaningful action to remedy the underpayments or ensure payroll compliance for any worker on the projects who was not represented by the LiUNA union.

These facts trigger joint-employer liability under the FLSA, VWPA, VOWA, VMWA, and Va. Code § 11-4.6; and satisfy the VWPA's "knowing" scienter for treble damages and civil penalties. Because these facts are deemed admitted or have otherwise been established by the record, they are uncontroverted. The Court should thus grant Plaintiffs' motion.

A.      **Liability for Unpaid Wages and Overtime**

Plaintiffs have alleged and provided declarations demonstrating that they performed manual labor on the Virginia hotel projects, regularly working more than forty hours per week. They were paid hourly and not on a salary basis. The amended complaint alleges that the Defaulted Defendants failed to pay Plaintiffs for all hours worked and failed to pay time-and-a-half for

overtime.

These actions violate not only the FLSA, which requires payment of minimum wages and overtime premiums under 29 U.S.C. § 207(a)(1), but also Virginia's wage statutes. The VWPA requires payment of all earned wages when due, Va. Code §§ 40.1-29(A), (C), (J); the VOWA incorporates the FLSA's overtime requirements and remedies, Va. Code § 40.1-29.2; and the VMWA requires payment of at least the applicable minimum wage, Va. Code § 40.1-28.9.

By defaulting, the Defaulted Defendants admit Plaintiffs' factual allegations. The admitted facts therefore state valid claims for unpaid wages and overtime under the FLSA and Virginia law. Moreover, Plaintiffs' testimony establishes the amount of wages due. Because the Defaulted Defendants failed to keep accurate payroll records, Plaintiffs may use their recollections to show the amount and extent of work, and the burden shifts to the employer to rebut the inference. *See Anderson*, 328 U.S. at 687–88; *Tyson Foods*, 577 U.S. at 454–58. The Defaulted Defendants have provided no contrary evidence; thus, Plaintiffs' damages calculations should be accepted.[8]

**B.      The Defaulted Defendants Are Joint Employers**

The undisputed facts demonstrate that Upland and Vargas Demo jointly employed Plaintiffs. Upland hired and supervised the workers and promised to pay them; Vargas Demo acted as a sub-subcontractor supplying labor; both entities retained time sheets, directed the work and controlled pay.

Under the Fourth Circuit's *Salinas* joint-employer test, the court considers whether the putative employers share or codetermine the terms and conditions of employment, including the ability to hire and fire, supervise and control work schedules, determine rates of pay, maintain

---

[8] The VWPA has a default 3-year statute of limitations; further, because the willfulness of the violations has been deemed admitted by the Defaulted Defendants and is clearly supported by the record, the Court should also find that a 3-year, rather than 2-year, statute of limitations applies for Plaintiffs' claims under the FLSA and VOWA.

records and share ownership or management. *See Salinas*, 848 F.3d at 141–47. The admitted facts satisfy these factors: Upland and Vargas Demo had authority over pay, schedules and work assignments; they maintained time records; the projects were performed on Axis' premises under Axis' oversight; and there was no disassociation between them. Therefore, Upland and Vargas Demo were Plaintiffs' joint employers and are jointly and severally liable for the unpaid wages.

Additionally, Jose Vargas and Melvin Aguilar are individuals who exercised operational control over significant aspects of Plaintiffs' employment and thus may be held personally liable as employers under the FLSA.

The Fourth Circuit applies an "economic reality test" to identify whether an individual is an "employer" under the FLSA. *See Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) ("Employers include those with managerial responsibilities and substantial control of the terms and conditions of the work of employees." (cleaned up)). The purpose of this test is to focus on considerations or facts that serve to identify individuals who would qualify as FLSA "employers," including whether the individual: "(1) has the power to hire and fire the employees, (2) supervise[s] and control[s] employee work schedules or conditions of employment, (3) determine[s] the rate or method of payment, and (4) maintain[s] employment records." *Id.* (citing *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). No one factor is dispositive. *Id.*

The VWPA, however, defines a joint "employer" as an "entity" rather than a "person." *See Cornell v. Benedict*, 301 Va. 342, 348 (2022). Consequently, while individuals may be liable for wage violations under the FLSA, VOWA, and VMWA, they are not subject to joint employer liability under the VWPA. *See id.* (explaining that the General Assembly used the word "entity" in the VWPA to limit liability to business entities).

Here, Jose Vargas and Melvin Aguilar were owners or managers of Vargas Demo and Upland who controlled day-to-day operations for each subcontractor, held themselves out as the persons responsible for paying wages, and failed to correct nonpayment despite knowledge of complaints. Defendants Vargas and Aguilar therefore are employers within the meaning of the FLSA, VOWA, and VMWA, and are jointly liable for those wage violations, but they are not jointly liable for the VWPA violations.

### C. No Exemption Applies

The employer bears the burden of proving that an exemption to the FLSA's overtime protections applies. *See E.M.D. Sales*, 604 U.S. at 49–54. None of the exemptions apply here. Plaintiffs were paid hourly and performed manual labor; they did not perform executive, administrative or professional duties. Moreover, payment on an hourly rate does not satisfy the salary-basis requirement for the white-collar exemptions, *see Helix*, 598 U.S. at 61, and the Defaulted Defendants have provided no evidence of any exemption. Consequently, Plaintiffs are non-exempt and entitled to the overtime protections of the FLSA.

### D. Damages: Unpaid Wages, Unpaid Overtime, Liquidated Damages, Treble Damages, Civil Monetary Penalties, and Prejudgment Interest

#### 1. Unpaid Wages and Overtime

Plaintiffs' declarations show each Plaintiff's regular hourly rate, the projects worked on, their dates of employment on each project, the approximate hours they worked per week, the approximate number of weeks they were not paid any wages at all, and the approximate number of weeks they were not paid overtime premiums for their overtime hours worked. The damages exhibit (Exhibit B) attached to this memorandum calculates unpaid straight-time wages and unpaid overtime premiums by taking the midpoint of the ranges provided for each Plaintiffs' estimates of weekly hours worked, multiplying the unpaid hours by the applicable rates (Plaintiffs' regular rate

multiplied by all unpaid hours up to 40 each week; and Plaintiffs' regular rate multiplied by 1.5 (overtime premium) and then multiplied by all hours worked over 40 each week).

Further, because Plaintiffs were not paid for *all* hours worked in certain weeks (as identified in their declarations), they are entitled to recover the full amount of their straight-time wages in those weeks plus the overtime premium for hours over forty per week under 29 U.S.C. § 207(a)(1). This is known as a "gap time" claim under the FLSA, which is explicitly recognized in the Fourth Circuit. *See Conner v. Cleveland Cty.*, 22 F.4th 412, 426 (4th Cir. 2022). Of course, Plaintiffs' regular hour wages are recoverable under the VWPA as well. *See Muratore v. Foster Aesthetics, L.L.C.*, No. CL23-7286, 2024 Va. Cir. LEXIS 117, at *17 (Cir. Ct. June 20, 2024) (The VWPA "prohibits wrongfully withholding wages and creates avenues of redress and specific damages for which an employer can be liable.").

These same calculations also establish liability and damages under the VOWA and VMWA. The VOWA incorporates the FLSA's overtime calculation methods and remedies and therefore entitles Plaintiffs to recover the same unpaid regular and overtime wages, as well as liquidated damages under state law. *See* Va. Code § 40.1-29.2. The VMWA entitles employees to recover unpaid minimum wages plus interest at eight percent per annum and attorneys' fees, Va. Code § 40.1-28.12; because Plaintiffs were not paid for all hours worked, their hourly wage fell below the statutory minimum during the unpaid periods, and the amounts owed under the other statutes also satisfy the minimum-wage shortfall (i.e., Plaintiffs are not seeking a double recovery).

2.     FLSA Liquidated Damages

Under 29 U.S.C. § 216(b), employers who violate the minimum wage or overtime provisions are liable for an additional equal amount as liquidated damages. Liquidated damages are awarded unless the employer shows it acted in good faith and with reasonable grounds for believing its actions were lawful; the employer bears a plain and substantial burden. *See Med.*

*Staffing*, 2025 U.S. App. LEXIS 17726, at *70–73. The Defaulted Defendants have defaulted and have offered no evidence of good faith. The undisputed facts show they knew workers were not being paid and continued operations. Accordingly, Plaintiffs are entitled to liquidated damages equal to the unpaid wages and overtime.

3.      Virginia Liquidated Damages and Treble Damages

Virginia law requires employers who fail to pay wages to pay the wages due plus an equal amount as liquidated damages and mandates prejudgment interest at eight percent. Va. Code § 40.1-29(J). For "knowing" violations—where the employer has actual knowledge, deliberate ignorance or reckless disregard of whether it is paying wages owed—the statute requires treble damages and attorneys' fees. *Id.* § 40.1-29(K). The facts in the record establish that the Defaulted Defendants were repeatedly warned that workers had not been paid; union representatives complained; and Upland's owner admitted cash-flow problems. Despite these warnings, they continued to withhold wages. These facts constitute at least reckless disregard, if not actual knowledge. Thus, the Court must award treble damages under Virginia law.

4.      Prejudgment Interest and Civil Monetary Penalties

Subsection (J) of the VWPA requires courts to award prejudgment interest at the rate of 8% per annum on unpaid wages. Plaintiffs' damages calculations include interest computed from August 1, 2023. Additionally, the statute authorizes a $1,000 civil monetary penalty for each willful violations of Subsection A of the VWPA, which are payable to the Virignia Commissioner of Labor and Industry "for deposit into the general fund of the State Treasurer." *See* Va. Code § 40.1-29(H).[9] The Court should award such penalties as part of the default judgment.

---

[9] Importantly, the civil penalties provided by Subsection H of the VWPA are enforceable by private attorneys general, such as Plaintiffs here. This is for two reasons. First, the plain meaning of Subsection J, which provides for a private right of action, provides that aggrieved employees may act as private attorneys general to enforce the civil penalties provided in Subsection H. *See* Va.

### 5. Plaintiffs' Damages Calculations

As Exhibit B demonstrates, Plaintiffs' actual damages have been calculated using the following formula for each work week during the relevant time period, which incorporates unpaid hours worked: (Plaintiffs' non-overtime hours worked each work week[10] x Plaintiffs' straight-time hourly rate of pay) + (Plaintiffs' overtime hours worked each work week x (Plaintiffs' regular rate of pay x 1.5)) – pay previously remitted to Plaintiffs for the applicable work week (i.e., for weeks were Plaintiffs received regular wages for all hours worked at the straight time rate).

Plaintiffs' liquidated and treble damages are simply multiples of Plaintiffs' actual damages—**however**, given that the VWPA does not directly provide for payment of overtime premiums, Plaintiffs have only calculated trebles damages for weeks where Plaintiffs were not paid any wages at all.

Plaintiffs have calculated prejudgment interest using the following method for each pay period: (1) Multiply Plaintiffs' actual damages by .08 (8%), the figure that results is the Yearly Payment Interest; (2) divide the Yearly Interest by 365 (number of days in a year)—this figure equals the Daily Interest amount; (3) multiply the Daily Interest amount by the number of days the damages are overdue;[11] and (4) the result is the interest due.

Finally, Plaintiffs have calculated civil monetary penalties of $1,000 for each violation (i.e., each workweek resulting in unpaid regular wages) pursuant to Va. Code § 40.1-29(H) and

---

Code § 40.1-29(J) ("In addition to any civil . . . penalty provided by this section[.]"). Second, courts, including the Fourth Circuit, have rejected similar arguments in the context of other statutes. *See, e.g.*, *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1113 (4th Cir. 1988).

[10] For calculation purposes, Plaintiffs used the midpoint of the range estimates for average work hours provided in their declaration. *See* Doc. 72-1, Pls.' Decls.

[11] For purposes of their prejudgment interest calculations, Plaintiffs have used August 1, 2023, as the date their actual damages were due. Importantly, this likely **undervalues** Plaintiffs' interest entitlement as the Manassas and Dulles Projects began in 2022. Plaintiffs thus believe this is a more than fair starting point for prejudgment interest.

(J). Importantly, each workweek where Defendants failed to pay all wages owed for each Plaintiff is considered a standalone violation of Subsection A of the VWPA.

Using these methods results in the following damages calculations, identified in Exhibit B:

- Actual Damages: **$332,311.64**;

- Liquidated Damages: **$332,311.64**;

- Treble Damages: **$176,602.86**;

- Prejudgment Interest (as of August 4, 2025): **$53,461.20**

- Civil Monetary Penalties: **$105,000.00**

  - Total Damages, Interest, and Penalties: **$999,687.35.**

*See generally* Exhibit B. Importantly, because of their entity status, Upland and Vargas Demo should be jointly and severally liable for all amounts above, totaling $999,687.35; conversely, because of their "person" status, Jose Vargas and Melvin Aguilar are excluded from liability under the VWPA, thus excluding them from liability for treble damages, prejudgment interest, and civil monetary penalties—their total liability is thus $664,623.29. *See Cornell*, 301 Va. at 348.

Because liability and the substantive elements for all claimed relief are established, Plaintiffs are entitled to judgment in the full amounts reflected in Exhibit B (subject to the per-defendant qualifications provided *supra*).

6.      Attorneys' Fees and Costs

The FLSA, VWPA, VOWA, and VMWA require that prevailing employees be awarded reasonable attorneys' fees and costs. *See* 29 U.S.C. § 216(b); Va. Code § 40.1-29(J). Fee-shifting encourages private enforcement and ensures that workers can vindicate their rights. Plaintiffs therefore respectfully request that the Court find Plaintiffs entitled to their responsible attorneys' fees and costs and allow Plaintiffs to file a fee petition after liability is resolved for all Defendants.

7.      Entry of Default Judgment and Need for Hearing

Because the Defaulted Defendants admit the complaint's well-pleaded factual allegations and because damages are for a sum certain or can be calculated with reference to Plaintiffs' affidavits, no evidentiary hearing is required. Fed. R. Civ. P. 55(b); *Basnight*, 2019 U.S. Dist. LEXIS 142400, at *4 ("To assess the extent of a plaintiff's damages, a district court may conduct an evidentiary hearing under Rule 55(b)(2), but it need not do so if the damages can be ascertained based on detailed affidavits or documents attached to the plaintiff's motion." (cleaned up)). Plaintiffs thus are receptive to moving forward without an evidentiary hearing and respectfully request that the Court enter judgment for the amounts requested without further proceedings.[12]

## VI.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

1. Enter default judgment against the Defaulted Defendants, jointly and severally (subject to the individual defendants' limitation of liability under the VWPA, as explained *supra*);

2. Award Plaintiffs damages as calculated in Exhibit B, including: (1) actual damages for unpaid straight-time wages and overtime premiums; (2) an equal amount as liquidated damages; (3) treble damages; (4) prejudgment interest; and (5) civil monetary penalties; totaling $999,687.35;

3. Award reasonable attorneys' fees and costs, to be substantiated in a separate fee petition;

4. Award post-judgment interest at the applicable federal rate; and

5. Grant any other relief the Court deems just and proper.

A proposed form of default judgment and order is submitted herewith.

Respectfully submitted this August 4, 2025,

---

[12] Axis, through counsel, has represented that it has "no objections or evidence to present on" Plaintiffs' default motions and also has "no interest in attending the default hearing."

_/s/ Robert W.T. Tucci_
Robert W.T. Tucci (VSB # 97446)
ZIPIN, AMSTER, & GREENBERG LLC
8757 Georgia Avenue, Suite 400
Silver Spring, Maryland 20910
Telephone:    (301) 587-9373
Facsimile:    (240) 839-9142
Email: rtucci@zagfirm.com

*Counsel for Plaintiffs*

31

# CERTIFICATE OF SERVICE

On August 4, 2025, I served ☐ *the original* ☒ *a true copy* of the foregoing document entitled:

- **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

on all the appearing and/or interested parties in this action as follows:

## ELECTRONIC TRANSMISSION ONLY:

Douglas M. Grimsley (VA Bar No. 70099)
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, Pennsylvania 15222
(412) 281.7272 – Telephone
(888) 811.7144 – Facsimile
dgrimsley@dmclaw.com

Scott A. Fenton (0068097)
Pro Hac Vice Admittance Granted 12/11/24
Dickie McCamey & Chilcote, P.C.
10 West Broad Street, Suite 1950
Columbus, Ohio 43215
(614) 484.1190 – Telephone
(888) 811.7144 – Facsimile
sfenton@dmclaw.com

Kristin L. Wedell (0072500)
Pro Hac Vice Admittance Granted 12/11/24
Dickie McCamey & Chilcote, P.C.
600 Superior Avenue East
Fifth Third Center, Suite 2330
Cleveland, Ohio 44114
(216) 685.1827 – Telephone
(888) 811.7144 – Facsimile
kwedell@dmclaw.com

*Attorneys for Defendant Axis Hospitality
Construction, LLC*

## MAIL ONLY:

Registered Agents Inc.

8401 Maryland Drive, Suite S
Henrico, Virginia 23294

*Agent for Service of Process of Defendant*
*Upland Hospitality Group LLC*

Suhelen Pacheco Lopez
1106 Clayton Ln., Suite 524
Austin, Travis County, Texas 78723

*Agent for Service of Process of Defendant*
*Vargas Demo and Paint, LLC*

Defendant Jose Vargas

Defendant Melvin Aguilar

☒ **(BY MAIL)** I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Silver Spring, Maryland in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

☐ **(BY OVERNIGHT MAIL)** I am personally and readily familiar with the business practice of ZIPIN, AMSTER, & GREENBERG LLC for collection and processing correspondence for overnight delivery, and I caused such document(s) described herein to be deposited for delivery to a facility regularly maintained by the USPS for overnight delivery.

☒ **(BY ELECTRONIC TRANSMISSION)** I caused said document(s) to be served via electronic transmission through either the Court's CM/ECF system, via electronic mail, or an electronic service provider to the addressee(s) listed above on the date below.

☐ **(BY PERSONAL SERVICE)** I delivered the foregoing document by hand delivery to the addressed named above.

I declare under penalty of perjury under the laws of the Commonwealth of Virginia that the foregoing is true and correct.

Executed on August 4, 2025, at Silver Spring, Maryland.

 */s/ Robert Tucci*
Robert W.T. Tucci